# Commonwealth ex rel. M'Lain *versus* Captain Wright, Provost Marshal.

3 G 437
le 19 SC 631

In cases of imprisonment under Federal authority, *not judicial,* the State and Federal courts have concurrent jurisdiction.

*Coram* LOWRIE, Chief Justice.

HABEAS CORPUS for the release of relator held as a drafted soldier.

The return of respondent denied the jurisdiction of the court, and was as follows:—

## RETURN.

*To the Hon., &c. &c. &c.:—*

Edward S. Wright, Provost Marshal of the department of the Monongahela, having constructively in his custody, as Provost Marshal of said department, Elry McLain. For return to a writ of habeas corpus issued by the Hon. Walter H. Lowrie, directed to said Captain E. S. Wright, Provost Marshal of the 22d Congressional District of Pennsylvania, and all

other persons restraining the liberty of Elry McLain, dated the 26th day of August, 1863, commanding him to produce before your honor the body of said Elry McLain, would respectfully submit, that he is not Provost Marshal of the 22d District, Pa., but is the Provost Marshal of the department of the Monongahela, and the said Elry McLain is held as a soldier in service of the United States, in the Provost Guard of the department of the Monongahela, now doing duty in Pittsburg.

The said Elry McLain was drafted into the United States military service under the provisions of an act of the Congress of the United States, approved July 17, 1862, entitled An act to amend the act calling forth the militia to execute the laws of the Union, suppress insurrection, and repel invasion, approved February 28, 1795, and the acts amendatory thereof, and for other purposes, and certain orders made by the President of the United States, through the War Department, entitled respectively General Orders No. 94 and No. 99, and dated respectively August 4, 1862, and August 9, 1862. The said orders being made in pursuance of the said act of Congress, and the latter order being entitled "Regulations for the enrolment and draft of three hundred thousand militia," and respondent asks that said act of Congress and said orders here produced in court may be taken and considered as a part of this return. That said Elry McLain was a citizen and resident of Fayette County, Pa., and was between the ages of 18 and 45 years, and was liable to do military duty under said act of Congress and said orders of the President, and he was regularly, and your respondent is advised, legally drafted in the United States military service on 16th October, 1862. That said Elry McLain failed to report at Camp Howe, the place of rendezvous designated for drafted men. That by virtue of the said orders and also a general order issued by General Canby, charged with the execution of the draft in the Department of Western Pennsylvania, and dated Pittsburg, Dec. 18, 1862, herewith produced, and which respondent asks to be taken as a part of this return. The said Elry McLain was arrested as a deserter or recusant by Capt. William B. Coulter, Provost Marshal of the 21st District, Pennsylvania, and was brought to Pittsburg and placed in custody of the Provost Marshal of the department of Monongahela, and by him held as a deserter. That said arrest took place in August, 1863, and the said Elry McLain was placed in respondent's custody on the        day of August, 1863, to be dealt with as a recusant or deserter. That afterwards, to wit, on the 12th day of August, 1863, the said Elry McLain, by consent of Major-General Brooks, in command of the department of the Monongahela, and with the consent of said Elry McLain, was mustered into

military service of the United States, in the Provost Guard of said department, to serve for the period of nine months, the time for which he had been drafted. That he is now charged with desertion and recusancy for which he was arrested, but no charges in form have as yet been made, nor will be prosecuted for said offence or offences, if he continues faithfully to discharge his duty as a soldier in said Provost Guard, as he has done since he entered said service. That by a further order of the War Department, dated July 1st, 1863, he is ordered to make known to your honor the cause of detention of the said Elry McLain in obedience to the writ of habeas corpus issued by your honor, and to submit to your honor that said Elry McLain, being, as above stated, in the military custody of the United States, charged with desertion and recusancy, he ought not to be required to produce the body of said Elry McLain before your honor.

Sworn and subscribed before me this 3d day of September, 1863,

> THOS. J. KEENAN,
>     Pro. Sup. Ct., W. D.
>                     EDWARD S. WRIGHT,
>                             Capt. and Provost Marshal.

*Henry D. Foster*, for the relator.

*Robert B. Carnahan*, for the respondent.

Opinion delivered at Pittsburg, Sept. 4th, 1863, by

LOWRIE, C. J.—When the first of these soldiers' cases came up before me recently on habeas corpus, no question was raised about the jurisdiction of the State judges to send this writ to a Federal officer. In the second case, the District Attorney of the United States, acting under instructions from the Provost Marshal General at Washington, did raise the question, and the case was adjourned in order that he might make such a return as would put his objection on the record; but he afterwards declined to make the objection in that case, and it was heard and decided on its own merits. Of course, I would not have heard it, if I had not believed that such cases are within judicial competence of the State judiciary; for the courtesy of the learned District Attorney could not supply my want of authority.

In the present cases the respondent, under the advice of the District Attorney, has made a return in which he excepts to my jurisdiction, and I have heard all that the counsel desire to say on the subject. I find nothing in what has been presented that weakens my long-entertained convictions, and I feel bound to

[Commonwealth ex rel. McLain *v.* Captain Wright, Provost Marshal.]

show that I have not been heretofore and am not now guilty of usurpation. Even some State judges have lately denied this jurisdiction to the State judiciary, and this makes its vindication the more important.

I observe a very recent decision of the Supreme Court of Michigan, *Spangler's Case,* in which two, and perhaps in which a majority of the judges seem to have acted on this principle; but they can scarcely be said to have *discussed* the question, however carefully they may have considered it; for they do not devote more than four or five sentences to it in all their published opinions. See Am. Law Reg. of Aug. 1863. And there, as here, the case was under the act of Congress of 1862, and the State draft.

They seem to form their decision on the opinion of the Supreme Court of the United States in the case of *Ableman* v. *Booth,* 21 Howard, 506, but that case decides only that a prisoner cannot be taken out of the custody of the judicial department of the Federal government by means of a habeas corpus issued by a State court. I do not understand the Chief Justice of the United States to have meant more than this; and if he did, he meant more than the case called for, and all beyond is mere *obiter dictum,* and cannot be taken by itself as sufficient authority for so important a principle.

The principle really decided in that case is a most important one, and I rejoice to believe that it is not now questioned by any one. It was disputed in Wisconsin in a very disorderly way, and out of that disorder that decision arose. It was questioned in our State in the case of Passmore Williamson, and twice decided to be correct. 2 Casey, 9; 3 Wright, 9. The point *decided* in those cases does not at all support the objection now under consideration.

Judges are the functionaries appointed for the trial of rights, and they may *commit* for trial, or in consequence of it, as a part of their general jurisdiction; and therefore they are not expected to show their authority for any particular act of imprisonment, except by their records, and to their judicial superiors. But all executive, legislative, and military functionaries, having no such power, must justify their restraints of liberty when their legality is disputed, before the judges to whose functions such questions finally belong; and the habeas corpus is the writ or suit by which they are required *to do so.* It is intended to operate on all extra-judicial restraints of liberty, and it, more clearly than any other remedy, expresses and embodies the principle that every man shall have a speedy hearing for his liberty, before the regular judges of his rights, and by due course of law.

This has been the law of ourselves and our ancestors for

[Commonwealth ex rel. McLain v. Captain Wright, Provost Marshal.]

several hundred years, and we have always found it conducive to liberty, and in very rare instances has it been used in a disorderly way; though it does require the judiciary very often to interfere with and set aside the acts of the very highest officers of other departments of the government. No conflict between them, on this account, is at all probable when each is sincerely desirous of being guided by the Constitution and the laws and ordinary usages of the country, as nearly as is reasonably practicable, and when each is reasonably respectful of the functions of the other, as each ought to be.

This is the nature of the writ of habeas corpus that is secured to every one by the Constitution of the United States. It was an institution or remedy so well known that it is not *described* in the Constitution, but merely *named*. It is, substantially at least, the habeas corpus described in the Chas. 1, and 16 Chas. 2, Statutes 31, though not always limited as they were, and these were substantially in force by adoption or re-enactment in all the States of the Union at the time the Federal Constitution was adopted, and this declares that the privilege of or right to this writ or suit shall not be suspended, unless invasion or rebellion make it necessary. Our statute was and is broader than the old English ones, and as broad as the modern English one. As then used, this remedy was entirely in the hands of the State judges, and was applicable to all sorts of extra-judicial restraints of liberty under any pretext whatever. *This*, therefore, is the right or privilege, then everywhere existing by State law, and by Federal law it was secured against suspension, and it nowhere appears that it was intended to be at all interfered with by the Federal Constitution, except in this liability to suspension. It is a man's right to bring his suit for his personal liberty and have it promptly tried.

Why, then, shall it now be said that Federal officers shall not obey a habeas corpus issued by a State judge? The Chief Justice of Michigan says, in *Spangler's Case*, that because an *offence* against the United States is exclusively cognizable in the Federal courts, therefore, "*the exercise of power* under such authority is equally under such exclusive jurisdiction." But, after a sincere and respectful effort to see that this consequence follows, I confess my inability to do so. The learned Chief Justice quotes Chancellor Kent for his premises, but not for his conclusion. But on the preceding page of the Commentaries, p. 440, the Chancellor lays down the rule to be that, in an imprisonment by a Federal officer by order or under pretext of Federal authority, not judicial, the State and Federal courts have *concurrent* jurisdiction by habeas corpus, and he cites many authorities for this.

Another of the learned judges in *Spangler's Case* says, "There

[Commonwealth ex rel. McLain *v.* Captain Wright, Provost Marshal.]

is enough appearing in the case to show that the commissioner, in good faith, claims to hold the relator under Federal authority; that this authority is not a mere pretext, but that the commissioner and the authorities under whom he acts are honestly endeavoring to carry into effect the requirements of the act of Congress (of 1862) and of the Federal executive, in a matter vital to the safety of the Union. The question, *therefore*, of the authority of the commissioner to hold his prisoner for the purpose stated is one which I think appropriately belongs to the Federal and not to the State courts." Here, again, I must confess my inability to perceive how the conclusion follows from the premises. The *sincerity* of the acts of the Federal officers does not seem to me to prove the *exclusive jurisdiction* of the Federal courts in relation to them. I rather incline to think that the learned judge did not intend so strong an inference.

I find, therefore, no authoritative decision that excludes the jurisdiction of the State judiciary in such cases. The Federal Constitution declares that the Federal judicial power shall extend to all cases in law or equity arising under the Federal Constitution and laws; but this has never been held to exclude the jurisdiction of the State courts from the trial of cases where one of the parties founds his claim on a Federal law; though it furnishes a constitutional justification of laws providing for a review of such cases by the Federal judiciary. Cases abound where the State judges have thus interfered by habeas corpus with the acts of Federal officers, 5 Binney, 512; 7 Barr, 336; 12 New Ham. 194; 11 Mass. 63, 67, 83; 24 Pich. 227; 10 Johns, 328; 7 Cowen, 471; 5 Hill, 16. Sergeant on the Const. 283–7. Hurd on Hab. Corp. 164.

Judge Story, in his work on the Constitution, gives the following quotation from the Federalist on this general subject: "When in addition to this we consider the State government, and the National Government, as they truly are, in the light of kindred systems, and as parts of *one whole*, the inference seems to be conclusive that the State courts would have a concurrent jurisdiction in all cases arising under the laws of the Union, where it was not expressly prohibited."

And the Constitution expressly provides that cases arising under Federal laws may be heard before State courts, when it declares that itself and the laws made in pursuance of it, shall be the Supreme law of the land, and that "the judges in every State shall be bound thereby," and requires all State judges to be sworn to support the Constitution of the United States. These provisions evidently allow the State judiciary to decide questions arising under Federal law, and require them to be guided by it; and they may arise as well in cases of habeas corpus as

in trespass, replevin, or ejectment. Nowhere is the Federal jurisdiction held or declared to be exclusive in such questions. Yet in the exercise of it, I admit the wisdom of the remark of Chief Justice Tilghman, that "this power should be exercised with very great caution, and never where there is any reasonable doubt." The State judge, in deciding upon a Federal law, ought to be extremely watchful that no State or local opinions, prejudices, or excitements should so influence his judgment as to cause him to misinterpret or misapply a Federal law, which is intended to sum up and express the *general* thought of the *nation* on the subject of which it treats, and not mere State or local thoughts.

The Federal Constitution and those of all the States secure to every man a judicial trial for all his rights of life, liberty, and property, and the habeas corpus is his regular and usual remedy or suit for his liberty, as others are for his property. There is nothing peculiar about it to make it a special object of Federal suspicion, and there is no very tangible ground for striking at *it* more than at any other judicial remedy, unless it be that it is more speedy, because personal liberty is dearer to men than any other rights. It is a suit for a man's right to himself, as debt, replevin, and ejectment are suits for his right to his money, his horse, or his land.

The objection relied upon, therefore, reaches much beyond the remedy by habeas corpus, and founds itself upon a much broader principle. It is this, that *the exercise of power under a claim of Federal authority can be complained against, only before the Federal courts;* and it is thus broadly stated by the Chief Justice of Michigan in *Spangler's Case.* In other words, it is this: *where any act is done professedly under Federal authority, no State court is competent to try whether private rights have been injured thereby.* I am unable to state the principle in any narrower form.

Why, then, are State judges sworn to support the Federal Constitution, and bound by it and by the laws made under it, if their authority ends when a question of Federal law is raised? This cannot be. It never has been so regarded, and surely we can have no better evidence of what is the actual law of the land than a reasonably uniform practice; unless it be statute law. The history of our jurisprudence pronounces against the broad principle which I have stated, and that is its conclusive condemnation. And we cannot avoid this consequence by limiting the principle to habeas corpus cases. That would be a mere arbitrary limitation, because founded on no reason. And it would be fruitless too; for it has always been regarded as law, that State judges may, by habeas corpus, try the validity of enlistments in the Federal army and in the volunteers,

[Commonwealth ex rel. McLain *v.* Captain Wright, Provost Marshal.]

when called out by Federal authority, as well as other cases of claims to liberty. And I doubt not that the records of the State courts here (Pittsburg) would show hundreds of such cases; I have tried some of them myself; but only two since the rebellion broke out, one of which I have already alluded to, and that was the only one in which my authority was questioned, except in my own mind. In the very first case I ever tried I had doubts, but they were entirely removed by an investigation which I then made of the law.

But if the broad principle which I have stated be true, then all this must be given up. Nay, more than this, much more. If a Federal marshal wrongfully arrests a man, or wrongfully uses him when arrested; or wrongfully seizes any man's property; or ejects him from his land; or a military officer wrongfully does the like; or imposes the punishment of the whipping post; or arrests and forces with the army one who is not drafted or enlisted; or if an army surgeon wrongfully and by plain *mala praxis* amputates the limb of a wounded soldier; or if any Federal officer wrongfully quarters a band of soldiers in a person's house, or enters malicious prosecution or suit against any one, and the defence be made that such things were done under Federal authority, then the citizen has no remedy in the State courts, but must seek the much less accessible Federal forums. This would be a partial denial of the right, by rendering suits unduly difficult to be brought.

Heretofore the law has always been that, for every wrongful act by *any* person, the sufferer had a right to sue in a State court, and if the supposed wrong-doer had any Federal authority under which he could defend himself, he was bound to defend himself there, and the State courts were bound to allow the defence according to the full legal effect of the Federal law. No doubt there is danger that the State courts may sometimes be overborne by local prejudices or excitements, so as not to give full effect to such defences, and, therefore, it has been thought proper to require that in such cases the Supreme Court of the United States should have a right of review. No doubt this rule is necessary, so that State judges may not become merely arbitrary in their dealing with Federal law, and if it does not apply to habeas corpus cases, I do not now see any reason why it may not be made to do so, under proper restrictions.

But, and I say it with great respect, I cannot avoid thinking that, in the light of all our previous practice, this objection indicates an undue suspicion of the State courts. I know that, in the trying circumstances in which the Federal government is placed by the present rebellion, it is entitled within the Constitution and law, to the generous sympathy of all American

[Commonwealth ex rel. McLain *v.* Captain Wright, Provost Marshal.]

citizens, and that all its measures ought to be liberally interpreted, and not narrowly criticized.

But, on the other hand, we can have no government unless there be mutual trust between the government and the people, and between the Federal and the State government. Mere *power* is not *authority*. An essential element of all natural and enduring authority is the *moral* quality that is involved in mutual trust between the governor and the governed—the Union and its elements; and this moral quality is never secured, but rather excluded, by force and distrust. When there is not such mutual trust, I venture to think that it is most likely to be secured by carefully avoiding all even apparent departures from the usual course of administering the Constitution and the laws, so far as is compatible with the work to be done, and thus preventing new causes of distrust. Reason, as well as law, therefore, forbids any departure in this class of cases.

If the State courts are not to be trusted with any jurisdiction in cases involving acts done under Federal laws, then our Federal Union is greatly weakened by the loss of *moral* bond; mere legal force cannot hold the States together. There *is* a moral bond strong enough to hold them, made up of the moral fibres of respect and affection for the Constitution and laws, as heretofore usually understood, and of those of our social relations and intercourse, and I cannot contribute to the sundering of a single one of them. We have found the old paths to be paths of pleasantness and peace, and I cannot help to lead into new and untried or doubtful ones; not, at least, until the *moral* authority of social custom and usage has prepared the way and made the paths straight and ready for social travel. Mutual envy and distrust rot those social fibres. Suspicion and strife dig pits and erect barricades in those paths, and produce all sorts of evasions and disorders in the social movement.

Not more than one in many thousands of the transactions of social life requires the *force* of law for its protection or execution, when the stability of the law and of its administration, and its harmony with social usages are such that its *influence* is sufficient to suppress all question and dispute. And then all engagements are incomparably better fulfilled than when the law is often called upon to apply its force; besides being more peaceably done. But when the law becomes so unsteady, and so discordant with social usages, that all may dispute it, then litigation and social alienations abound, and the social bond gives tokens of social dissolution. If our mutual alienation has gone so far that the State courts cannot be trusted to administer "the Supreme law of the land," it seems to me that it is quite time for us to begin to doubt our ability to maintain our Federal Union; though very possibly I may over-estimate this

[Commonwealth ex rel. McLain *v.* Captain Wright, Provost Marshal.]

danger.   The States do not now generally distrust the Federal courts, and I think there has heretofore been but little Federal distrust of State courts; but if Federal distrust has grown or is to grow to the extent of the principle involved in this question, and Federal courts and court officers be multiplied in every State sufficient to meet the demands of such a principle, and if the State courts find themselves continually reminded, by the application of the principle, of the distrust entertained towards them by the Federal government, then this distrust will soon become mutual, and grow up into a chronic alienation, and produce, or very strongly tend to produce, Federal dissolution. Let us be cautious, candid, generous and free from partisan or local excitement in the administration of the law; and let us reflect much before we adopt so dangerous a principle, either by judicial interpretation or by positive legislation.   Trust the State judges with the administration of such Federal law as ordinarily comes before them, and they will generally do right, as the experience of three-quarters of a century has proved. But put upon them the mark of Federal distrust, and you invite the people to regard Federal law as something alien to their system and suspicious in its character, and therefore a law that is to be opposed or evaded.

I feel, therefore, that I am bound under the penalties of the habeas corpus act to entertain jurisdiction of this class of cases, and the respondent, under the same penalty, must obey the writ.   If the relator appear on the hearing to have regularly become a soldier, he must answer for all military offences committed after that before the military authority, and not before the civil courts.

Enter rule to show cause why an attachment should not issue against respondent for want of a sufficient return, returnable on Saturday, September 12, at 9 o'clock A. M.

NOTE.—This case involving the question of the liberty of the citizen and the jurisdiction of the State courts in questions of habeas corpus, when persons are claimed for military service of the United States, I deem no apology necessary for publishing *in extenso* the following two able opinions by way of note.   It is true they might be abridged, but in doing so, great injustice might be done the learned judges by whom they were delivered.